# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MATTHEW WALKER,
*Plaintiff,*

v.                                               No. 3:19-cv-00888 (VAB)

ACCENTURE PLC and ACCENTURE LLP,
*Defendants.*

## RULING AND ORDER ON MOTION TO DISMISS AND MOTIONS FOR SANCTIONS

Matthew Walker ("Plaintiff") has sued Accenture PLC and Accenture LLP (together, "Defendant" or "Accenture") under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2002e-2 ("Title VII"). Am. Compl., ECF No. 43 (Mar. 13, 2020). He seeks to sue on behalf of "[a]ll individuals who are not of South Asian race or Indian national origin who applied for positions with (or within) Accenture in the [United States] and were not hired, who were employed by Accenture but not promoted, and/or who Accenture involuntarily terminated." *Id.* ¶ 36.

Accenture has moved to dismiss the Amended Complaint. Mot. to Dismiss or, in the Alternative, Strike or Modify the Class Allegations, ECF No. 44 (Apr. 27, 2020) ("Def.'s Mot.").

Accenture and Mr. Walker have also cross-moved for sanctions. Mot. Seeking Sanctions Pursuant to Rule 11 and 28 U.S.C. § 1927, ECF No. 49 (Sept. 9, 2020) ("Def.'s Mot. for Sanctions"); Pl.'s Opp'n to Accenture's Mot. Seeking Sanctions Pursuant to Rule 11 and 28 U.S.C. § 1927 and Cross-Req. for Rule 11 Sanctions, ECF No. 52 (Oct. 21, 2020) (Pl.'s Cross-Req. for Sanctions").

For the following reasons, Accenture's motion to dismiss is **DENIED**.

With respect to Accenture's motion for sanctions, and Mr. Walker's cross-motion for sanctions, these are **DENIED** without prejudice to renewal until Mr. Walker's claims are addressed on the merits through an appropriate dispositive motion or at trial.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Factual Allegations[1]

#### 1.   The Parties

Accenture PLC is a "multinational professional services company that provides consulting, technology, strategy, digital, and operations services to clients located worldwide." Am. Compl. ¶ 7. Accenture PLC "maintains approximately 48 offices in the United States and employs about 51,800 employees locally." *Id.*

Accenture LLP is a wholly-owned subsidiary of Accenture PLC and provides similar business services. *Id.* ¶ 8.

Mr. Walker, a Caucasian man who resides in California, *id*. ¶ 5, allegedly "worked for Accenture from November 2011 through "at least June 2015" as "an application performance consultant and was a member of [Accenture's] technology consulting segment," *id.* ¶ 28. Mr. Walker allegedly "holds a B.S. in Accounting and Information Systems from San Jose State University and has over ten years of professional experience." *Id.* ¶ 27. During his time at Accenture, he allegedly "traveled to various client sites across the [United States]" and "was responsible for identifying, diagnosing, and resolving performance issues relating to clients' applications." *Id.* ¶ 28.

---

[1] All factual allegations are drawn from the Amended Complaint.

2.      **Accenture's Hiring Process**

Accenture allegedly "contracts with [United States] companies to provide IT-related services," and after securing a contract, "hires individuals to fill positions to service the client." *Id.* ¶ 14. After they complete a client-specific project, individuals allegedly "are placed in an unallocated or unbillable status, also known as being 'benched.'" *Id.* While on the bench, "individuals must again seek new positions within Accenture, going through an application and interview process, just as external applicants must." *Id.*

Individuals, including "[e]mployees who are on the bench," allegedly apply to positions at Accenture through "two internal portals: MyScheduling and Careers Marketplace." *Id.* ¶ 15. Once an application is submitted, an employee's resume is allegedly "reviewed by the client team that posted the open role to confirm the employee's qualification for the position," and the client team then contacts the employee's "Talent Fulfillment Specialist," who matches benched employees to open roles based on the worker's availability and skill set. *Id.* Talent Fulfillment Specialists therefore allegedly "serve as a gatekeeper for benched employees, as their input can either streamline an employee for a certain role or block him or her from further consideration by Accenture." *Id.* Accenture also allegedly "has a policy to terminate employees who are on the bench for more than [ ] forty days." *Id.* ¶ 24.

In January 2016, Accenture allegedly "introduced a new platform called Performance Achievement and began offering quarterly appraisals" of employees. *Id.* ¶ 23. Under the Performance Achievement program, employees allegedly receive one of three appraisal ratings: either "Need Improvement, "Continue to Grow," or "Promoted." *Id.* Those who receive "strong appraisals from their managers" are allegedly "more likely to receive a promotion." *Id.*

### 3.    Accenture's Allegedly Discriminatory Hiring Practices

Accenture allegedly "engages in a practice of securing H-1B and L-1 visas for South Asian workers located overseas" to staff their positions in the United States. *Id.* ¶ 17. Accenture allegedly "seeks to maximize the number of visas it receives each year from the federal government" by "submit[ting] visa petitions for more positions than actually exist in the [United States] . . . to maximize its chances of securing the highest number of available H-1B visas from the lottery process." *Id.* ¶ 18. From 2015 to 2018, Accenture allegedly "received 20,378 new H-1B visas (or visa amendments) and 432 new L-1 visas (or visa amendments)." *Id.* These individuals are allegedly "placed in Accenture's inventory of visa workers for use on future projects in the [United States]." *Id.*

"Visa-ready" individuals are allegedly "given preference" in job applications. *Id.* ¶ 19. Accenture also allegedly "specifically earmark[s]" certain job postings "for Global Careers Program Candidates ('GCPs'), *i.e.*, visa holders, further limiting opportunities for non-South Asians." *Id.* As Accenture has allegedly stated in its filings with the United States Securities and Exchange Commission, "[a]n important element of our global business model is the deployment of our employees around the world, which allows us to move talent as needed," and "increased regulation of immigration or work visas, including limitations placed on the number of visas granted," could cause difficulties in staffing employees and increase costs. *Id.* ¶ 21.

Accenture also allegedly "gives preference to South Asian candidates" when "conducting local hiring," or hiring of individuals already residing within the United States. *Id.* ¶ 22. Accenture's recruiters allegedly "disproportionately seek out and recruit South Asian candidates," and Accenture then allegedly gives preference to South Asian candidates "over

comparably or better qualified non-South Asian candidates," and also gives preference to "South Asian and Indian contract workers." *Id.*

Accenture also allegedly "promotes South Asians at disproportionately high rates compared to non-South Asians." *Id.* ¶ 23. South Asians allegedly are "regularly awarded higher appraisal scores" on the Performance Achievement platform as "compared to their non-South Asian colleagues, and, as a result, South Asians are regularly promoted at substantially higher rates than non-South Asians." *Id.* As Mr. Walker alleges, "the vast majority of Accenture's managerial and supervisory positions in the [United States] are filled by South Asian individuals." *Id.*

Non-South Asian employees also allegedly are terminated "at disproportionately high rates compared to South Asians." *Id.* ¶ 24. This is allegedly because "South Asians are given preference for new positions, and these individuals are used to displace non-South Asians on existing projects," which "relegate[s] [non-South Asian employees] to the bench and unable to secure new positions within Accenture," ultimately leading to termination under Accenture's forty-day policy. *Id.*

Mr. Walker alleges that several of these practices, including the practice of relying on visa workers to staff positions in the United States; the practice of applying for large numbers of work visas; the practice of internally allocating employees; the practice of retaining contract workers; and the hiring and project-staffing process as a whole "result[] in available positions overwhelmingly going to South Asian individuals, to the exclusion of non-South Asians." *Id.* ¶ 25.

These practices have also allegedly impacted "[t]he composition of Accenture's U.S. workforce," as "at least 70 [percent] (if not more) of Accenture Consulting and Accenture

Technology's United States-based workforce is South Asian (primarily from India), as is the vast majority of its managerial and supervisory-level staff." *Id.* ¶ 26.

### 4.   Mr. Walker's Employment with Accenture

Mr. Walker alleges that during his time at Accenture, he "performed well" in his role, at least one client was "impressed by [his] performance and later asked for him to return for subsequent projects," and on another project he "consistently worked extra hours each week" to keep the project on track. *Id.* at ¶ 29. He allegedly, however, "was never promoted by Accenture during his 3.5 years with the company." *Id.*

Mr. Walker alleges that at the end of each of his projects, he was placed on the "bench," and during each time on the bench, "he diligently applied to open positions listed on MyScheduling and reached out to his Talent Fulfillment Specialist for support," but "often received no response to his applications." *Id.* ¶ 30.

In June 2015, Mr. Walker allegedly received a call from his "Career Counselor" at Accenture, "who informed him of his termination." *Id.* ¶ 31. The Career Counselor allegedly told Mr. Walker that he was being terminated "due to his prolonged bench period and lack of billable hours, but that he would be marked as eligible for rehire in Accenture's files." *Id.*

Mr. Walker alleges that between 2016 and 2019, he applied to more than twenty different positions with Accenture on its Alumni Network site for former employees, but Accenture "failed to hire him each time." *Id.* at ¶¶ 32-33. He allegedly was "well qualified for these roles, given his over ten years of experience in performance engineering and the fact that he held a similar role at Accenture for over 3.5 years," but only was contacted by Accenture for one interview. *Id.* ¶ 34. He allegedly often received "generic rejections from the company which noted that either his 'skills and experience [did] not match Accenture's current needs'" or that

Accenture had "decided to pursue other candidates," and on other occasions received "no response at all." *Id.* (alteration in original).

Additionally, on four occasions between December 2016 and August 2017, Mr. Walker allegedly reached out to recruiting personnel "to inquire about open positions matching his performance engineering skill set." *Id.* ¶ 35. On each occasion, he allegedly received a "generic e[-]mail response" stating Accenture did not have "any open positions that [met his] skills and career objectives." *Id.*

### 5.   Class Allegations

Mr. Walker seeks to bring his lawsuit on behalf of "[a]ll individuals who are not of South Asian race or Indian national origin who applied for positions with (or within) Accenture in the [United States] and were not hired, who were employed by Accenture but not promoted, and/or who Accenture involuntarily terminated." *Id*. ¶ 36.

He alleges that there are numerous questions of law and fact common to members of the class, including "whether Accenture has intentionally discriminated against individuals who are not South Asian in its hiring, promotion, and termination decisions"; "whether Accenture has intentionally favored South Asians in hiring, promotions, and terminations and/or whether Accenture has intentionally disfavored non-South Asians in hiring, promotion/demotion, and termination decisions"; "whether Accenture's policy and practice of relying on South Asian visa and local workers is intentionally discriminatory"; "whether Accenture has violated § 1981 . . . [and/or] Title VII"; "whether equitable and injunctive relief is warranted for the class"; and "whether compensatory and/or punitive damages are warranted for the class." *Id.* ¶ 38. He also alleges that his claims are typical of the class; he will fairly and adequately protect the interest of

other class members; and he and other class members have suffered substantial injury as a result of Accenture's actions. *Id.* ¶¶ 39-41.

He argues that class certification is appropriate under both Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), as well as, in the alternative, 23(c)(4). *Id.* ¶¶ 42-44.

### B. Procedural History

On June 7, 2019, Mr. Walker filed a Complaint against Accenture. Compl., ECF No. 1 (June 7, 2019).

On June 21, 2019, Mr. Walker moved to consolidate his case with *Bayat v. Accenture*, No. 3:18-cv-1602 (VAB). Mot. to Consolidate Cases, ECF No. 14 (June 21, 2019). On August 2, 2019, Accenture opposed the motion to consolidate. Mem. in Opp'n to Mot. to Consolidate, ECF No. 32 (Aug. 2, 2019). On August 26, 2019, Mr. Walker replied to Defendant's opposition. Reply, ECF No. 39 (Aug. 26, 2019). On February 12, 2020, the Court denied the motion to consolidate. Order, ECF No. 42 (Feb. 12, 2020).

On March 13, 2020, Mr. Walker filed an Amended Complaint. Am. Compl. The Amended Complaint sets forth three counts: Count One alleges disparate treatment on the basis of race in violation of 42 U.S.C. § 1981; Count Two alleges disparate treatment on the basis of race and national origin in violation of Title VII, 42 U.S.C. § 2000e-2; and Count Three alleges disparate impact on the basis of race and national origin in violation of Title VII. *Id.* ¶¶ 45-59.

On April 27, 2020, Accenture moved to dismiss the Amended Complaint on the grounds that Mr. Walker's claims were barred by the statute of limitations; that Mr. Walker lacked standing to pursue claims on his own or on behalf of a class; that he failed to exhaust administrative remedies; that he otherwise failed to state a claim; and that he failed to establish personal jurisdiction over Accenture PLC. Def.'s Mot.; Mem. in Support of Mot. to Dismiss,

ECF No. 43 at 13 (Mar. 13, 2020) ("Def.'s Mem."). Accenture also moved to, in the alternative, strike or modify the class allegations. Def.'s Mot; Def.'s Mem.

On June 2, 2020, Mr. Walker opposed Accenture's motion to dismiss. Mem. in Opp'n to Mot. to Dismiss, ECF No. 47 (June 2, 2020) ("Pl.'s Opp'n").

On June 25, 2020, Accenture replied to Mr. Walker's opposition. Reply, ECF No. 48 (June 25, 2020) ("Def.'s Reply).

On September 9, 2020, Accenture moved for sanctions under Federal Rule of Civil Procedure 11(b)(3) and 28 U.S.C. § 1927. Def.'s Mot. for Sanctions; Mem. of L. in Supp. of Def.'s Mot. Seeking Sanctions Pursuant to Rule 11 and 28 U.S.C. § 1927 ("Def.'s Mem. in Supp. of Sanctions").

On October 21, 2020, Mr. Walker opposed Accenture's motion for sanctions and cross-moved for sanctions. Pl.'s Mot. for Sanctions.

On November 12, 2020, Accenture replied to Mr. Walker's opposition to its motion for sanctions and cross-request for sanctions. Reply, ECF No. 53 (Nov. 12, 2020) ("Def.'s Reply in Supp. of Sanctions").

On December 10, 2020, the Court held a hearing by videoconference on the motion to dismiss and the cross-motions for sanctions. Min. Entry, ECF No. 59 (Dec. 10, 2020).

## II.      STANDARD OF REVIEW

### A.    Rule 12(b)(1)

Federal courts are "courts of limited jurisdiction." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). "Congress has granted district courts original jurisdiction over . . . certain cases between citizens of different states, so long as the requirements of complete diversity and amount in controversy are met." *Purdue Pharma L.P. v. Kentucky*, 704

F.3d 208, 213 (2d Cir. 2013). The burden of persuasion for establishing diversity jurisdiction rests on the party asserting it. *Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010); *see also Herrick Co. Inc. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322–23 (2d Cir. 2001) (the party asserting diversity jurisdiction "bears the burden of demonstrating that the grounds for diversity exists and that diversity is complete."). The party invoking the court's jurisdiction must support allegations of complete diversity with "competent proof." *Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998). "[W]hen a federal court concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

"A case is properly dismissed for lack of subject matter jurisdiction under [Federal Rule of Civil Procedure] 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); Fed. R. Civ. P. 12(b)(1). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the [C]ourt must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000); *see also Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (quoting *Sweet*, 235 F.3d at 83). The Court also may resolve disputed jurisdictional fact issues, however, "by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Karlen ex rel. J.K. v. Westport Bd. of Educ.*, 638 F. Supp. 2d 293, 298 (D. Conn. 2009) (citing *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000)).

**B. Rule 12(b)(2)**

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). The

plaintiff therefore must make a prima facie showing that jurisdiction exists. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

"The prima facie showing must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.*; *see also Glenwood Sys., LLC v. Med-Pro Ideal Sols., Inc.*, No. 3:09-cv-956 (WWE), 2010 WL 11527383, at *2 (D. Conn. May 4, 2010) ("At this stage of the proceedings, if the court relies upon pleadings and affidavits, the plaintiff must make out only a prima facie showing of personal jurisdiction, and the affidavits and pleadings should be construed most favorably to the plaintiff."), *aff'd*, 438 F. App'x 27 (2d Cir. 2011) (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)). A court considers the facts as they existed when the plaintiff filed the complaint. *See id.* (citing *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 52 (2d Cir. 1991)).

A court must apply Connecticut's long-arm statute, which provides that "a trial court may exercise jurisdiction over a foreign defendant only if the defendant's intrastate activities meet the requirements both of [the state's long-arm] statute and of the due process clause of the federal constitution." *Thomason v. Chem. Bank*, 234 Conn. 281, 285-86 (1995). If the court has personal jurisdiction over the defendant under the long-arm statute, the court will consider whether jurisdiction would comport with the Due Process Clause of the United States Constitution. *See Licci ex rel. Licci v. Lebanese Canadian Bank*, 723 F.3d 161, 168 (2d Cir. 2013); *see also Lombard Bros., Inc. v. Gen. Asset Mgmt. Co.*, 190 Conn. 245, 250 (1983) (explaining that the

court need only address due process considerations if it determines that jurisdiction exists under the long-arm statute).

### C.  Rule 12(b)(6)

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), a court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. A court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss

for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff,

accepting the complaint's allegations as true.")).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review

"to the facts as asserted within the four corners of the complaint, the documents attached to the

complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy*

*v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider

"matters of which judicial notice may be taken" and "documents either in plaintiffs' possession

or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs.,*

*Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp.

2d 140, 144 (D. Conn. 2005).

## III.   DISCUSSION

There are three motions before the Court: (1) Accenture's motion to dismiss or, in the

alternative, to strike or modify class allegations; (2) Accenture's motion for sanctions against

Mr. Walker; and (3) Mr. Walker's cross-request for sanctions against Accenture.

The Court addresses each motion in turn.

### A.  Accenture's Motion to Dismiss the Amended Complaint

Accenture makes several arguments in support of its motion to dismiss. Def.'s Mem.

First, Accenture argues that Mr. Walker's Section 1981 claims based on events before June 7,

2016 are untimely. *Id.* at 9-10. Accenture also argues that Mr. Walker's Title VII claims based

on events before August 25, 2018, are similarly time-barred. *Id.* at 10-12. In Accenture's view,

the continuing violation doctrine also does not apply to make either the Section 1981 or Title VII

claim timely. *Id.* at 12-13.

Second, Accenture argues that Mr. Walker lacks standing to pursue claims for termination, internal staffing, promotion, or respective relief on his own or on behalf of a class because he released his claims and because he is a former employee, which Accenture argues precludes certain prospective relief. *Id.* at 14-18.

Third, Accenture argues that Mr. Walker's disparate impact claims should be dismissed because he has failed to exhaust administrative remedies and also to identify a facially neutral policy that caused a disparate impact. *Id.* at 18-25.

Fourth, Accenture argues that Mr. Walker's Section 1981 and Title VII disparate treatment claims are implausible. *Id.* at 25-28.

Fifth, Accenture argues that Mr. Walker's Section 1981 claim should be dismissed because it concerns alleged discrimination on the basis of national origin, not race. *Id.* at 28-31.

Finally, Accenture argues that Mr. Walker has failed to allege sufficient facts to establish personal jurisdiction over Accenture PLC, or that Accenture PLC employed him. *Id.* at 31-32.

The Court addresses each argument in turn.

### 1. Standing

Because federal courts are courts of limited jurisdiction, "[c]ustomarily, a federal court first resolves any doubts about its jurisdiction over the subject matter of a case before reaching the merits or otherwise disposing of the case." *Cantor Fitzgerald, L.P, v. Peaslee,* 88 F.3d 152, 155 (2d Cir. 1996); *see also Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir. 1990) ("the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined.") (citing 5 WRIGHT & MILLER, FED. PRAC. & PROC. § 1350, 548 (1969)).

14

Accenture argues that Mr. Walker does not have standing to pursue this action. Def.'s Mem. at 14-18. Because standing is a threshold issue that affects this Court's subject-matter jurisdiction, the Court will address this issue before taking up other grounds for dismissal. *See Cantor Fitzgerald*, 88 F.3d at 155.

Standing is a constitutional requirement rooted in Article III of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."). "Standing, moreover, like other jurisdictional inquiries, cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *Thompson v. Cty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (citation, internal quotation marks and alterations omitted).

To demonstrate standing, a plaintiff must allege an injury-in-fact that is fairly traceable to defendant's conduct and is likely to be redressed by judicial action. *Allen v. Wright*, 468 U.S. 737, 751 (1984); *see also Lujan*, 504 U.S. at 560-61 ("Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (citations, internal quotation marks and alterations omitted); *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (to establish standing, a "plaintiff must have (1) suffered an injury in fact, (2)

15

that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

redressed by a favorable judicial decision.") (citing *Lujan*, 504 U.S. at 560).

"[E]ach element [of standing] must be supported in the same way as any other matter on

which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence

required at the successive stages of the litigation. At the pleading stage, general factual

allegations of injury resulting from the defendant's conduct may suffice, for on a motion to

dismiss we presume that general allegations embrace those specific facts that are necessary to

support the claim." *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (quoting *Lujan*, 504 U.S. at 561).

But if a plaintiff does not meet his burden of demonstrating such an injury, he does not

have standing, and the Court must dismiss that plaintiff's claims. *See* FED. R. CIV. P. 12(b)(1);

*see also Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of

establishing [standing]."); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 96 (1998)

("In a long and venerable line of cases, this Court has held that, without proper jurisdiction, a

court cannot proceed at all, but can only note the jurisdictional defect and dismiss the suit.").

Accenture argues that Mr. Walker lacks standing for two reasons: first, because he

released his claims under the terms of the Separation Agreement, and second, because, as a

former employee, he lacks standing to bring his claims for injunctive relief. Def.'s Mem. at 14-

18.

The Court disagrees.

As to Accenture's first argument, while the Court may consider matters outside the

pleadings in a Rule 12(b)(1) analysis, Accenture asks the Court to not only take judicial notice

of, but also to evaluate on the merits the validity and applicability of the terms of the Separation

Agreement. *See* Def's Mem. at 25-26 ("By signing the Separation Agreement and releasing all

discrimination claims, [Mr.] Walker cannot claim any injury arising from his employment and thus lacks standing to bring the instant action on his own behalf."). But the "validity of a release is a peculiarly fact-sensitive inquiry." *Emps. Committed for Just. v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 436 (W.D.N.Y. Sept. 29, 2005) (citing *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437-38 (2d Cir.1998)). Though Accenture cites several cases in this Circuit and others in which courts have concluded that a plaintiff lacks standing where he or she signed a similar release, most of these were decided at the summary judgment phase – not on a motion to dismiss. *See id.* at 15 (citing *United States v. Twenty Miljan-350 IED Jammers*, 669 F.3d 78 (2d Cir. 2011) (affirming the district court's grant of a motion to strike or for summary judgment); *Corines v. Charter One Bank*, 365 F. App'x 237 (2d Cir. 2010) (affirming the district court's grant of a motion for summary judgment); *Sutherland v. Touhey*, 182 F.3d 901 (2d Cir. 1999) (unpublished table op.) (same); *Malaney v. Elal Israel Airlines*, 331 F. App'x 772 (2d Cir. 2009) (same)). Indeed, in *Malaney*, the Court converted the motion to dismiss into a motion for summary judgment after the defendants had provided sufficient notice to the plaintiff that they sought summary judgment in the alternative.[2] *Malaney*, 331 F. App'x at 774.

Accenture has not asked the Court to convert the motion to dismiss into one for summary judgment such that the Court would be permitted to substantively evaluate the terms of the Separation Agreement. *See, e.g., Williams v. Black Ent'mt Tele., Inc.*, No. 13-cv-1459 (JS) (WDW), 2014 WL 585419, at *8 (E.D.N.Y. Feb. 14, 2014) ("As Defendants correctly note, the General Release is a document outside of the pleadings, and therefore would require conversion of their motions to dismiss to one for summary judgment."). Nor has Mr. Walker appended a

---

[2] Accenture's citation to *Rajasekhar v. Envtl. Data Res., Inc.*, No. 3:18-cv-01535 (JAM), 2019 WL 2743579 (D. Conn. July 1, 2019), is also unavailing: there, the court made clear that the plaintiff had "attached materials to his complaint reflecting his entry into a separation-and-release agreement," making it "appropriate for the Court to consider the entire separation agreement as attached to [the defendant's] motion to dismiss." *Id.* at *2 n.1.

copy of the Separation Agreement to his Complaint. *See Rajasekhar*, 2019 WL 2743579, at *2 n.1. In fact, while Mr. Walker "has acknowledged the [Separation Agreement], [he] has also raised some issues regarding . . . that contract," *see Williams*, 2014 WL 585419, at *8, arguing, for example, that "[t]he purported release document does not even appear to be valid even on its face" because it allegedly lacks consideration and "applies only to claims that accrued [up to June 6, 2015]," *see* Pl.'s Opp'n at 12.

The Court therefore declines at this stage to consider whether the Separation Agreement precludes Mr. Walker from having standing to assert his claims. For the same reason, the Court declines to consider whether the Separation Agreement, as Accenture argues, "dooms the majority of [Mr.] Walker's class allegations." Def.'s Mem. at 15.

Accenture also argues that because Mr. Walker is a former employee, he does not have standing to bring claims for injunctive relief against their former employers because they do not stand to benefit from any injunction. *Id.* at 17. To make this argument, Accenture relies primarily on the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 364 (2011).

Where a plaintiff seeks injunctive relief, he or she must establish "a real and immediate threat of repeated injury" demonstrated by more than "[p]ast exposure to illegal conduct." *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983). "[A]bstract injury is not enough; rather, the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (internal quotation marks and alteration omitted). Plaintiffs seeking prospective relief "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998). Generally, then, "[f]ormer employees lack standing to obtain injunctive relief because they are no longer affected by the challenged

policies, and an injunction would do nothing to remedy their past injuries." *Oakley v. Verizon Comc'ns Inc.*, No. 09 Civ. 9175 (CM), 2012 WL 335657, at *15 (S.D.N.Y. Feb. 1, 2012).

However, "several courts have held that the former employee does have standing to seek prospective relief." *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 466 (S.D.N.Y. 2013) (collecting cases). In *Kassman*, the court concluded that there were "several reasons that the language from *Dukes* . . . should not be read to hold categorically that a former employee seeking reinstatement can never seek injunctive or declaratory relief against his or her former employer." *Id.* at 467. These were (1) that it was "not clear from [the relevant passage in *Dukes*] whether the Supreme Court itself reached the conclusion that former employees lacked standing or merely accepted as its premise the Ninth Circuit's judgment on that issue"; (2) to the extent the *Dukes* Court did reach that issue, "it did not have occasion to consider the specific question presented here—namely, whether a former employee seeking reinstatement has standing to seek[] injunctive relief"; and (3) the *Dukes* Court "did not need to reach the question of whether a former employee seeking reinstatement would have standing to seek injunctive relief" to decide the case. *Id.* at 467-68.

The court in *Kassman* thus "follow[ed] those courts that have held that a plaintiff seeking reinstatement has standing to pursue injunctive or declaratory relief." *Id.* at 468. As the court there explained, "[a] specific request for reinstatement absent a corresponding injunction would expose plaintiffs to the immediate threat of further discrimination," because, "should plaintiffs prevail, and should a court grant them reinstatement, they have a very real interest in a court issued injunction preventing their employer from engaging in the same or substantially identical discriminatory behavior." *Id.* at 466 (quoting *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 122 (S.D.N.Y. 2012)).

19

Several courts in this Circuit and others have adopted the logic in *Kassman* to conclude that plaintiffs have standing where they seek reinstatement as a form of relief and were allegedly terminated for improper reasons. *See, e.g.*, *Hill v. City of New York*, No. 13-cv-6147 (PKC) (JO), 2019 WL 1900503, at *3 n.6 (E.D.N.Y Apr. 29, 2019) (quoting *Kassman*); *Savage v. Temple Univ.*, No. 19-6026-KSM, 2020 WL 3469039, at *7 (E.D. Pa. June 25, 2020) (slip op.) (same); *Tolton v. Day*, No. 19-945 (RDM), 2020 WL 2542129, at *37 (D.D.C. May 19, 2020) ("Nothing in *Dukes* or any other binding authority precludes a plaintiff asserting an employment discrimination claim from seeking reinstatement as a remedy, and reinstatement is an injunctive remedy."); *Chen-Oster v. Goldman, Sachs & Co.*, 251 F. Supp. 3d 579, 589 (S.D.N.Y. Apr. 12, 2017) (finding prior "determination that *Dukes* categorically foreclosed former employees from seeking injunctive and declaratory relief [to be] clearly erroneous," and joining "the chorus of opinions in this district that hold that a former employee seeking reinstatement has standing to seek injunctive and declaratory relief").

And, though Accenture relies on *Oakley* to argue that former employees lack standing to obtain injunctive relief, *see* Def.'s Mem. at 18, courts in the Southern District of New York have since explained that the *Oakley* ruling is not in tension with the logic in *Kassman* because in *Oakley*, the court "did not discuss whether the former employees sought reinstatement; [and] even if the plaintiffs were seeking reinstatement, the former employees would lack standing to seek injunctive relief because they would not be injured by the challenged practice if reinstated" as the practice had discontinued several years prior. *Chen-Oster*, 251 F. Supp. 3d at 588 n.2.

Accenture nevertheless contends that dismissal is warranted because "the possibility of [Mr. Walker] working at Accenture again – and the risks [Mr.] Walker claims to fear – are too speculative to establish standing." Def.'s Reply at 5 (citing *Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 409 (2013)). As Accenture argues, because Mr. Walker "allegedly applied for at least

21 positions at Accenture, but has not been interviewed for any," this "suggest[s] that the

possibility of future discriminatory treatment is highly speculative." *Id.* at 6. Accenture,

however, provides no factual basis for its claim that the failure to interview Mr. Walker for these

positions renders his claims for reinstatement sufficiently "speculative" so as to dismiss them at

this stage, *see id.* at 5-6, nor does it provide any authority from this Circuit or elsewhere

explaining how even a remote risk of future employment renders any prospective reinstatement-

based claim to relief invalid as a matter of law.

Accordingly, the Court will not dismiss Mr. Walker's claims on the basis of standing, and

therefore need not, and does not, reach Accenture's argument as to whether Mr. Walker has

standing to bring his claims on behalf of the putative class. *See* Def.'s Mem. at 18; *see also*

*Flynn v. DIRECTV, LLC*, No. 15-cv-1053 (JAM), 2016 WL 4467885, at *5 (D. Conn. Aug. 23,

2016) ("Courts are generally reluctant to dismiss class allegations at the pleading stage.") (citing

*Chenesky v. N.Y. Life Ins.*, No. 07 Civ. 11504 (WHP), 2011 WL 1795305, at *1 (S.D.N.Y.

2011)).

The Court next turns to the question of whether Mr. Walker's Section 1981 or Title VII

claims are time-barred.

### 2. Timeliness of the Section 1981 and Title VII Claims

The parties disagree as to the applicable statute of limitations for Mr. Walker's § 1981

claim, as well as whether his Title VII claims are time-barred.

Accenture argues that the applicable statute of limitations for § 1981 claims is three years

and, accordingly, that Mr. Walker's termination claim, and "[a]ny claims that accrued before

[his] alleged termination—including his claims related to promotion and internal staffing" are

also untimely. Def.'s Mem. at 9-10. Accenture argues further that under Title VII, a plaintiff

must file an administrative claim with the EEOC within 300 days of the allegedly discriminatory

acts. *Id.* at 10. Accenture argues that, since Mr. Walker filed his EEOC charge on June 21, 2019,

the Court may only consider events that occurred after August 25, 2018, which renders "any

Title VII claims based on events during his employment at Accenture—including his

termination, promotion, and internal staffing claims" time-barred. *Id.* at 11. In Accenture's view,

Mr. Walker's failure-to-rehire claims are similarly time-barred to the extent they are based on

positions he applied to after his termination, but before August 25, 2018. *Id.*

      Mr. Walker argues that the statute of limitations for § 1981 "terminations, most

promotions, and staffing claims is four years," not three, under 28 U.S.C. § 1658(a), which

creates a catch-all four-year statute of limitations for federal causes of action created after 1990.

Pl.'s Opp'n at 7 (citing *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 382 (2004)). Mr.

Walker argues that since the Amended Complaint alleges that he was notified that he was being

terminated in June 2015, and worked at Accenture through at least June 2015, and he filed his

EEOC Complaint on June 7, 2019, Accenture cannot meet its burden of establishing that Mr.

Walker's termination or failure to promote claims are time-barred. *Id.* at 8. Mr. Walker argues

further that it is premature to decide the statute of limitations issue at this stage of the litigation,

where the continuous violation doctrine may apply to Accenture's hiring practices. *Id.* at 8-9.

      The Court agrees.

      In Connecticut, § 1981 actions traditionally have had a three-year statute of limitations.

*See Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 131 (2d Cir. 1996) ("Since § 1981 does not have a

statute of limitations, federal courts use the most analogous state statute of limitations in claims

brought under § 1981 . . . In Connecticut, the applicable period is the three[-]year statute of limitations in tort.").

In *Jones v. R.R. Donnelley & Sons Co.*, however, the Supreme Court considered the effect of 28 U.S.C. § 1658, which creates a catch-all statute of limitations of four years for any "civil action arising under an Act of Congress enacted after [December 1, 1990]," on claims under § 1981. 541 U.S. at 372. The Court concluded that the catch-all statute of limitations is applicable to § 1981 claims "if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." *Id.* at 382.

"In 1991, Congress 'added two subsections to § 1981.'" *Gilbert v. Dep't of Correction*, No. 3:10-cv-1877 (JBA), 2014 WL 6471415, at *5 (D. Conn. Nov. 18, 2014) (quoting *Ortiz v. City of New York*, 755 F. Supp. 2d 399, 404 (E.D.N.Y. 2010)). "Section 1981(b) now defines contractual formation and enforcement, protected by subsection (a), to include 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Ortiz*, 755 F. Supp. 2d at 404 (quoting 42 U.S.C. § 1981(b)). "Through that amendment, Congress extended § 1981 to apply to 'harassing conduct that occurred after the formation of the contract'—i.e., during employment, not merely during the formation of the employment contract." *Hubert v. Dep't of Corrections*, No. 3:17-cv-248 (VAB), 2018 WL 1582511, at *10 (D. Conn. Mar. 30, 2018) (citing *Jones*, 541 U.S. at 372-73); *see also Miller v. Bridgeport Police Dep't*, No. 3:14-cv-00689 (JAM), 2016 WL 3086402, at *6 (D. Conn. May 31, 2016) ("In light of Congressional amendments to § 1981, it is true that a 4-year statute of limitations applies to certain kinds of § 1981 claims that challenge *post*-contract-formation conduct that had been previously determined by the U.S. Supreme Court not to be actionable under § 1981.").

Accenture cites four cases from this District, including one from this Court, in which a three-year statute of limitations has been applied to a § 1981 claim. *See* Def.'s Mem. at 9-10 (citing *Rafi v. Yale Univ, Sch. of Med.*, No. 3:14-cv-01582 (VAB), 2017 WL 3205548, at *13 (D. Conn. July 27, 2017); *Rivera v. Men's Wearhouse, Inc.*, No. 3:05-cv-1907 (WWE), 2006 WL 1801705, at *4 (D. Conn. June 27, 2006); *Farzan v. Bridgewater Assocs.*, No. 3:16-cv-00835 (SRU), 2017 WL 354685, at *13 (D. Conn. Jan. 24, 2017); and *Oyelola v. Hartford Fin. Servs. Grp.*, No. 3:12-cv-01685 (JCH), 2014 WL 496880, at *8 (D. Conn. Feb. 5, 2014)). Those cases, however, do not diminish the applicability of *Jones* to Mr. Walker's claim. In *Rafi*, the plaintiff's claim arose out of a failure to hire, or a pre-contractual arrangement, which does not fall within the ambit of a post-1990 amendment to § 1981. *See* 2017 WL 3205548 at *3 ("Dr. Rafi claims that Dr. Lifton's interference in his job applications . . . continues to this day."). In both *Farzan* and *Rivera*, the court primarily relied on pre-*Jones* cases reciting the standard that the Connecticut state statute of limitations governs § 1981 actions, without analyzing the applicability of *Jones*. *See Rivera*, 2006 WL 1801705, at *4 (citing *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660 (1987); *Ortiz v. Prudential Ins. Co.*, 94 F. Supp. 2d 225, 233 (D. Conn. 2000)); *Farzan*, 2017 WL 354685, at *13 (citing *Lewis v. Conn. Dep't of Corrections*, 355 F. Supp. 2d 607, 621 n.10 (D. Conn. 2005), which relied exclusively on pre-2004 cases *Walker v. Jastremski*, 159 F.3d 117, 119 (2d Cir. 1998) and *Holt*, 95 F.3d at 131). And *Oyelola* relied exclusively on the authority of *Rivera*.[3] *See* 2014 WL 496880 at *8.

---

[3] Defendants' reliance on *Andrews v. Fremantlemedia, N.A. Inc.*, 613 F. App'x 67, 68 (2d Cir. 2015) is also unavailing, as the Second Circuit there did not explicitly consider whether the statute of limitations was three or four years but instead analyzed a different question: whether the statute of limitations began to run at the time that plaintiffs became aware of the discriminatory act, or the time the act occurred. *Id.* at 68-69. The precise question of the applicable length of the statute of limitations, an issue here, was not squarely before the court.

Because Mr. Walker's claims arise after he established a contractual arrangement with Accenture, the Court therefore applies the four-year statute of limitations under 28 U.S.C. § 1685 to Mr. Walker's § 1981 claims, and turns to whether his claims were properly filed within that period.

Mr. Walker alleges that his tenure with Accenture ended in June 2015, though the Complaint does not specify a termination date. Am. Compl. ¶¶ 28, 31. He filed his lawsuit before the EEOC on June 7, 2019. *See* Compl. Accenture argues that the Court should take "judicial notice of" and consider a declaration from Shelly Amick, a senior manager at Accenture LLP, in determining Mr. Walker's precise termination date. *See* Def.'s Mem. at 4 n.2; Def.'s Reply at 1-2 (citing Amick Aff., ECF No. 49-2 (Sept. 9, 2020)). Accenture also urges the Court to consider what it represents to be a separation agreement between Mr. Walker and Accenture, purportedly dated June 6, 2015. Def's Mem. at 4, 4 n.2 (citing ECF No. 32-9 (Aug. 2, 2019) (the "Separation Agreement")). Accenture argues that the Amick affidavit and the Separation Agreement are judicially noticeable, even at the motion to dismiss stage, because the release was previously appended to Accenture's opposition to Mr. Walker's motion to consolidate, and Mr. Walker "did not dispute or otherwise object to the existence or the validity of the release on reply."[4] Def.'s Mem. at 4-5 n.2.

Mr. Walker argues that the Court cannot consider the Separation Agreement, as this "would improperly rely on materials outside the pleadings," and further argues that in any event, the Separation Agreement is "factually incorrect," because "he was not terminated on June 6, 2015" but "continued working at Accenture after June 6, 2015." Pl.'s Opp'n at 8 n.2.

The Court agrees.

---

[4] The Amick affidavit was also attached to Defendant's opposition to the motion to consolidate. *See* ECF No. 32-8 (Aug. 2, 2019).

"While a statute of limitations defense is not ordinarily considered on a motion to dismiss, it is appropriate if the dates in question are undisputed." *Pinkston v. Connecticut*, No. 3:09-cv-633 (JCH), 2009 WL 2852907, at \*2 (citing *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.")); *see also Chisholm v. United of Omaha Life Ins.*, 514 F. Supp. 2d 318, 324 (D. Conn. 2017) ("While a statute of limitations defense is most often pleaded as an affirmative defense and may require a factual inquiry beyond the face of the complaint, a defendant may raise the statute of limitations in a Rule 12(b)(6) motion where the dates in a complaint show that an action is barred by a statute of limitations.") (internal quotation marks, alterations, and citation omitted). "However, '[w]here . . . a complaint does not demonstrate facial infirmity with respect to the statute of limitations, a motion to dismiss on this ground must fail." *Gibson v. Metropolis of CT LLC*, No. 19-cv-00544 (KAD), 2020 WL 956981, at \*2 (D. Conn. Feb. 27, 2020) (slip op.) (quoting *Bartold v. Wells Fargo Bank, N.A.*, No. 14-cv-00865 (VAB), 2015 WL 7458504, at \*4 (D. Conn. Nov. 24, 2015) (quotation marks and citation omitted)).

The dates in question are not undisputed, nor does the face of the Amended Complaint establish that Mr. Walker's § 1981 claims are plainly time-barred.[5] *See* Am. Compl. ¶ 28 ("Mr. Walker worked for Accenture from November 2011 through at least June 2015."); Pl.'s Opp'n at 8 n.2 ("Mr. Walker was not terminated on June 6, 2015. He continued working at Accenture after

---

[5] The dispute as to Mr. Walker's actual termination date remains even if the Court takes judicial notice of the Amick affidavit and the Separation Agreement, which it need not, and does not, do. The Amick affidavit lists Mr. Walker's employment as continuing only through "June 2, 2015," Amick Aff. ¶ 5, but states that he signed the Separation Agreement on "June 6, 2016," *id.* ¶ 11. The Separation Agreement is dated June 6, 2015, but does not state a date of termination, only that his employment "will be terminated." Separation Agreement at 2.

June 6, 2015."). The Court therefore cannot resolve on the face of the pleadings whether Mr.

Walker's § 1981 claims are time-barred as a matter of law.

As to Mr. Walker's Title VII claims, Mr. Walker does not dispute Defendant's argument

that his claims prior to August 15, 2018 would ordinarily be barred under Title VII's statute of

limitations. Def.'s Mem. at 10-11 (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708,

712 (2d Cir. 1996) ("[O]nly events that occurred during the 300-day period prior to filing [the

EEOC charge] . . . are actionable under Title VII."); *Roberts v. Judicial Dep't*, No. 99-cv-14

(RNC), 2001 WL 777481, at *3 (D. Conn. Mar. 28, 2001) ("Because plaintiff filed his EEOC

complaint on or about April 16, 1998, the 300-day period extends back to approximately June

20, 1997."); *Chase v. N.Y.C. Bd. of Educ.*, 166 F.3d 1199 (2d Cir. 1998) (table) (affirming

dismissal of Title VII claim as untimely where plaintiff filed his complaint with the EEOC "well

over 300 days after he was fired"). Instead, Mr. Walker argues that his Title VII claim should

survive because the Court should permit discovery to determine whether the continuous violation

doctrine applies to his case. Pl.'s Opp'n at 9-10.

The Court agrees, at least with respect to this stage of the case.

The continuing violation exception provides that "if a Title VII plaintiff files an [Equal

Employment Opportunity Commission] charge that is timely as to any incident of discrimination

in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under

that policy will be timely even if they would be untimely standing alone." *Chin v. Port Auth.*,

685 F.3d 135, 155-56 (2d Cir. 2012). Under this doctrine, a Title VII claim is not "time[-]barred

so long as all acts which constitute the claim are part of the same unlawful employment practice

and at least one act falls within the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536

U.S. 101, 122 (2002); *see also id.* at 120 (affirming the plaintiff's hostile work environment

claim where the "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers") (citation omitted). By contrast, "[t]he continuing violation doctrine [does] not" apply "to discrete unlawful acts, even where those discrete acts are part of a 'serial violation[],' but" rather applies "to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzales v. Hasty*, 802 F. 3d 212, 220 (2d Cir. 2015).

The statute of limitations defense, however, again "is an affirmative defense, and therefore generally not appropriate for a motion to dismiss." *Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 3:11-cv-282 (JCH), 2012 WL 162361, at *3 (D. Conn. Jan. 19, 2012). Because "[a] statute of limitations analysis is generally riddled with questions of fact which the Defendants must establish in order to bar Plaintiffs' claims," *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 354 (D. Vt. 2010); a defendant may only raise such a defense in a pre-answer motion to dismiss "where the dates in a complaint clearly show that an action is barred by a statute of limitations." *Bartold,* 2015 WL 7458504, at *4 (D. Conn. Nov. 24, 2015) (citing *Ghartey*, 869 F.2d at 162); *see also OBG Tech. Servs., Inc. v. Northrop Grumman Space & Mission Sys. Corp.*, 503 F. Supp. 2d 490, 503 (D. Conn. 2007) ("A statute of limitations defense . . . requires a factual inquiry beyond the face of the complaint.").

Mr. Walker has alleged a "pattern or practice of discrimination against non-South Asian . . . applicants and employees." *See, e.g.*, Am. Compl. ¶ 3. The scope of this allegation includes events that extend beyond the August 15, 2018, 300-day deadline under Title VII. *See id.* ¶ 33 (citing seven alleged failure-to-hire incidents after that date).

Whether the alleged events both prior to and after August 15, 2018 constitute a continuing pattern of discrimination triggering the continuing violation doctrine or, instead, are

discrete events is a question better addressed on a summary judgment motion after discovery. *See Bice v. Robb*, 324 F. App'x 79, 81 (2d Cir. 2009) (holding that the district court erred in granting a motion to dismiss on statute of limitations grounds for a breach of contract claim because factual development was needed to determine "what the alleged promise meant," and whether it was a "continuing obligation" such that "each successive breach may begin the statute of limitations running anew"); *Bartold*, 2015 WL 7458504, at *4-5 (D. Conn. Nov. 24, 2015) (denying motion to dismiss CUTPA claims as time barred, finding that factual development was needed to determine whether there is evidence that later wrongful acts are sufficiently related to the earlier acts to trigger the continuing violations doctrine); *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 210 (S.D.N.Y. 2014) (denying motion to dismiss conversion claim as time-barred because factual development was needed as to when the alleged conversion actually took place); *Allen v. Egan*, 303 F. Supp. 2d 71, 74, 79 (D. Conn. 2004) (denying motion to dismiss equal protection claims against supervisors who allegedly "engaged in a pattern or practice of discriminating against employees on the basis of age" as time barred because "[d]etermining whether the events comprising the basis for [plaintiff]'s claim are part of a single, continuing course of conduct is fact-intensive, and therefore inappropriate at this stage of the proceedings").

Accordingly, Accenture's motion to dismiss Mr. Walker's Section 1981 and Title VII claims as time-barred will be denied.

### 3. The Title VII Claims

Accenture argues that Mr. Walker's Title VII disparate impact and disparate treatment claims, or Counts Two and Three, fail for several reasons. First, Accenture argues that Mr. Walker failed to exhaust his Title VII disparate impact claim because he allegedly failed to

identify a specific and facially neutral employment practice undertaken by Accenture in his

EEOC charge. Def.'s Mem. at 19-22. Second, Accenture argues that Mr. Walker fails to state a

claim for disparate impact in his Amended Complaint because he allegedly provides "no notice

of any specific 'facially neutral' policy or practice, and fail[s] to identify any disparate impact

resulting form such a policy or practice." *Id.* at 22-25. Finally, Accenture argues that Mr.

Walker's Title VII disparate treatment claim is implausible and fails to allege sufficient facts to

show that race or national origin were "but for" causes of any adverse action described in the

Complaint. *Id.* at 25-28.

The Court addresses each argument in turn.

### a. Exhaustion Under Title VII

"As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue

available administrative remedies and file a timely complaint with the EEOC." *Deravin v. Kerik*,

335 F.3d 195, 200 (2d Cir. 2003). "It is not enough merely to file a complaint with the EEOC;

with certain exceptions, the administrative complaint must identify each alleged form of

discrimination and each defendant against whom it is articulated." *Newsome v. IDB Cap. Corp.*,

No. 13-cv-6576 (VEC), 2014 WL 4211351, at *2 (S.D.N.Y. Aug. 26, 2014) (citing *Deravin*, 335

F.3d at 201; *Johnson v. Palma*, 931 F.2d 203, 209 (2d Cir. 1991)). Claims not included on an

initial EEOC charge "must be dismissed in a subsequent action under Title VII unless they are

'reasonably related' to the claims that the EEOC investigated." *Id.* (citing *Deravin*, 335 F.3d at

200-01).

Accenture does not argue that Mr. Walker failed to file a timely complaint with the

EEOC, but instead argues that Mr. Walker has failed to exhaust his claim because his EEOC

charge did not identify a "specific employment practice" supposedly causing a disparate impact.

Def.'s Mem. at 20 (citing *Meacham v. Knolls Atomic Power Lab*, 554 U.S. 84, 100 (2008)). As Accenture argues, "[c]hallenges to Accenture's 'hiring decision-making process as a whole,' and 'internal employee allocation practices,' are exactly the kind of 'generalized' policies and practices that fail to apprise the EEOC and the employer of the basis for the claim and thus fall short of the exhaustion requirement." *Id.*

Mr. Walker argues that he has exhausted his administrative remedies under Title VII because the allegations in the Complaint supporting his disparate impact claim are "substantively identical" to those in his EEOC charge. Pl.'s Opp'n at 25-26. Mr. Walker argues that the relevant inquiry as to exhaustion is merely that the claims be "reasonably related" to the plaintiff's EEOC charge, and his EEOC charge provided notice of "exactly what Plaintiff would be alleging in this lawsuit with respect to his disparate impact claim," *Id.* at 26-27. In Mr. Walker's view, Accenture's arguments as to exhaustion instead speak to the merits of Mr. Walker's claim. *Id.* at 27.

The Court agrees.

Though Accenture cites case law from this Circuit establishing, for example, that plaintiffs must "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two," *Chin*, 685 F.3d at 151 (internal quotation marks and citations omitted); *see also Attard v. City of New York*, 451 F. App'x 21, 24 (2d Cir. 2011) ("In order to establish a prima facie case of disparate impact, a plaintiff must show (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." (internal quotation marks omitted)), Accenture fails to cite any authority from this Circuit or others that this inquiry should be made at the

31

exhaustion stage rather than in evaluating the merits of the claim. To the contrary, in the cases

cited by Accenture and in others across this Circuit, courts have considered these questions not

with respect to exhaustion but instead on the merits of the claim as a matter of law. *See, e.g.*,

*Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 277 (S.D.N.Y. 2001) (dismissing

disparate impact claim for failure to allege "any specific employment policy or practice which

might be actionable under Title VII"); *Kulkarni v. City Univ. of N.Y.*, No. 01 Civ. 10628 (DLC),

2003 WL 23319, at *3 (S.D.N.Y. Jan. 3, 2003) (affirming dismissal of disparate impact claim

focused on an "overall decision making process").

Accordingly, because Accenture does not argue, and there is no clear indication that, Mr.

Walker's EEOC complaint was not timely filed, or that the Amended Complaint is not

"reasonably related" to the EEOC claim,[6] *see Deravin*, 335 F.3d at 200-01, the Court finds that

Mr. Walker has not failed to exhaust his disparate impact claim, and considers Accenture's

arguments as part of its evaluation of whether Mr. Walker has failed to state a claim.

### b.  The Title VII Disparate Impact Claim

Title VII prohibits "both intentional discrimination (known as 'disparate treatment') as

well as, in some cases, practices that are not intended to discriminate but in fact have a

disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v.

DeStefano*, 557 U.S. 557, 577 (2009). "To prevail under the disparate impact theory of liability, a

plaintiff must show that the employer 'uses a particular employment practice that causes a

disparate impact on the basis of race, color, religion, sex, or national origin.'" *Chin*, 685 F.3d at

151 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). A plaintiff must "(1) identify a specific

employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal

---

[6] Indeed, Accenture concedes that "[Mr.] Walker's allegations [in his Amended Complaint] with respect to 'outwardly neutral practices' are substantively identical to those listed in his EEOC charge." Def.'s Mem. at 22.

32

relationship between the two." *Id.* (internal quotation marks and citations omitted); *see also Gupte v. Watertown Bd. of Educ*, No. 3:17-cv-283 (JCH), 2018 WL 4054880, at *5 (D. Conn. Aug. 24, 2018) ("[T]o state a claim under a disparate impact theory, [a plaintiff] must allege that a specific employment practice has an unequal effect on members of a protected class."). A plaintiff "falls short by merely alleging a disparate impact[] or pointing to a generalized policy that leads to such an impact." *Meacham*, 554 U.S. at 100 (2008) (internal quotation marks and alteration omitted). Rather, the plaintiff must "isolat[e] and identif[y] the *specific* employment practices that are allegedly responsible for any observed statistical disparities." *Id.* (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (emphasis and alterations in original).

Accenture argues that Mr. Walker has failed to state a claim for disparate impact because "his allegations provide no notice of any specific facially neutral policy or practice, and fail to identify any disparate impact resulting from such a policy or practice." Def.'s Mem. at 22-23. In Accenture's view, Mr. Walker's allegations are "either too generic to satisfy the requirement of alleging a specific employment practice, or else sound in disparate treatment." *Id.* at 22 (internal quotation marks omitted). Accenture argues further that even if the allegations sound in disparate impact, Mr. Walker has not shown how these practices "causally resulted" in disparities in Accenture's workforce or impacted him specifically. *Id.* at 23. Accenture claims that the only fact offered in support of the alleged disparate impact is Mr. Walker's claim that "at least 70 [percent] (if not more) of Accenture Consulting and Accenture Technology's United States-based workforce is South Asian (primarily from India)," which Accenture alleges is insufficient to allege causation and "meaningless" without a showing that it "makes other plausible non-discriminatory explanations very unlikely." *Id.* at 23-24 (citing *Burgis v. N.Y. Dep't of*

*Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d

Cir. 1999)).

Mr. Walker argues that he has satisfied each of the three elements required of a disparate

impact claim. Pl.'s Opp'n at 17-19. He argues that he is not required to allege a "specific

employment practice" under Title VII, but instead may set forth evidence of a defendant's

"decisionmaking process" for purposes of his disparate impact claim. *Id.* at 18-19. He argues

further that even if he is required to set forth a specific employment practice, he has sufficiently

satisfied this prong of the analysis through his allegations that "Accenture has five specific

employment practices that have a disparate impact on non-South Asians and non-Indians,"

including (1) Accenture's alleged applications for "massive amounts of U.S. work visas . . .

without regard to available positions or need"; (2) Accenture's alleged preference to visa holders

over internal and external candidates in staffing client positions; (3) Accenture's alleged practice

of internally allocating employees; (4) Accenture's alleged practice of retaining contract

workers, who are primarily South Asian; and (5) Accenture's policy of terminating employees on

the bench for more than approximately forty days. *Id.* at 19-20. Finally, Mr. Walker argues that

he is not required at the pleading stage to set forth detailed descriptions of Accenture's

employment practices because this information is "within Accenture's sole position and control."

*Id.* at 20.

The Court agrees.

Taking the Amended Complaint in the light most favorable to Mr. Walker, as it must, Mr.

Walker identifies several "specific employment practices," including its "practice in securing H-

1B and L-1 visas for South Asian workers located overseas who will then be used to staff U.S.

positions," Am. Compl. ¶ 16; its preference afforded to "visa-ready" individuals, *id.* ¶ 19; how

its "recruiters disproportionately seek out and recruit South Asian candidates, [who are] then

give[n] . . . preference over comparably or better qualified non-South Asian candidates," *id.* ¶ 22;

its "preference to South Asian and Indian contract workers," *id.* ¶ 22; its "promot[ion] [of] South

Asians at disproportionately high rates compared to non-South Asians," linked to South Asian

"individuals [being] regularly awarded higher appraisal scores, compared to their non-South

Asian colleagues," *id.*; and its "policy to terminate employees who are on the bench for more

than approximately forty days," which results in "non-South Asians [being] disproportionately

relegated to the bench" given that "South Asians are given preference for new positions," *id.*

¶ 24. As Mr. Walker alleges, "several of [these] employment practices have a disparate impact

on non-South [Asian] applicants and employees." *Id.* ¶ 25 (reciting the earlier-described alleged

employment practices).

Accenture argues that these are too "generic" to satisfy the first prong of alleging a

"specific employment practice." Def.'s Mem. at 22. But Accenture cites no case law – and this

Court has not identified any either – showing a heightened level of specificity applies in the

context of post-1991 Title VII claims. Instead, the Second Circuit has made clear that the

requirement for plaintiffs to identify a "specific employment practice" is not a result of its

concern with hyper-specificity in describing these practices but rather stems from its conclusion

that a plaintiff may not only rely on statistical evidence to prove a disparate impact claim. *See*

*Malave v. Potter*, 320 F.3d 321, 326 (2d Cir. 2003) ("First, a plaintiff must 'identify a specific

employment practice, rather than rely on bottom line numbers in an employer's workforce.'").

Indeed, the requirement to provide a "specific employment practice" exists, at least in part, "to

'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it

rests.'" *Kulkarni v. City of New York*, No. 01 Civ. 10628 (DLC), 2002 WL 1315596, at *2
(S.D.NY. June 14, 2002) (quoting *Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002)).

Taking the Amended Complaint in the light most favorable to Mr. Walker, as is required,
Mr. Walker identifies several "specific employment practices," including its "practice in
securing H-1B and L-1 visas for South Asian workers located overseas who will then be used to
staff U.S. positions," Am. Compl. ¶ 16; its preference afforded to "visa-ready" individuals, *id.*
¶ 19; how its "recruiters disproportionately seek out and recruit South Asian candidates, [who
are] then give[n] . . . preference over comparably or better qualified non-South Asian
candidates," *id.* ¶ 22; its "preference to South Asian and Indian contract workers," *id.* ¶ 22; its
"promot[ion] [of] South Asians at disproportionately high rates compared to non-South Asians,"
linked to South Asian "individuals [being] regularly awarded higher appraisal scores, compared
to their non-South Asian colleagues," *id.*; and its "policy to terminate employees who are on the
bench for more than approximately forty days," which results in "non-South Asians [being]
disproportionately relegated to the bench" given that "South Asians are given preference for new
positions," *id.* ¶ 24. As Mr. Walker alleges, "several of [these] employment practices have a
disparate impact on non-South [Asian] applicants and employees." *Id.* ¶ 25 (reciting the earlier-
described alleged employment practices).

The Amended Complaint therefore gives Accenture fair notice of the Accenture's alleged
practices, such as disproportionately securing visas for, recruiting, staffing, awarding higher
appraisal scores to, and promoting South Asian workers, on which Mr. Walker's claims rely. *See
Jenkins v. N.Y.C. Transit Auth.*, 646 F. Supp. 2d 464, 470 (S.D.N.Y. 2009) (where "he plaintiff's
Complaint identifies a specific employment practice, and "[i]t is plain that the plaintiff is

alleging that the policy has a disparate impact," "[t]he allegations in the Complaint are therefore sufficient to state a claim of disparate impact"). [7]

As to causation, Accenture argues that Mr. Walker "fails to connect the dots to show how these alleged practices" resulted in disparities, nor does he show that these practices "impacted him specifically," relying on *Brown v. Coach Stores, Inc.*, 30 F. Supp. 2d 611, 613 (S.D.N.Y. 1997). Def.'s Mem. at 23. But Mr. Walker has offered more than "vague allegations about how [Accenture] hires, promotes, and trains its employees," *see Brown*, 352 F. Supp. 2d at 613. In *Brown*, the Court noted that the plaintiff "relie[d] principally on some very general statistics . . . regarding the minority composition of the overall Coach workforce," and that she "identifie[d] no affirmative policy, practice, or criteria that ha[d] causally resulted in the alleged disparities in defendant's workforce." *Id.* Here, however, as discussed above, Mr. Walker has identified several potential employment practices, policies or criteria sufficient to establish a prima facie disparate impact claim. And he alleges, at multiple places in his Complaint, that these practices in particular "have a disparate impact on non-South [Asian] applicants and employees." Am. Compl. ¶ 25 (discussing five alleged Accenture policies and their alleged impact on non-South Asian workers).

Mr. Walker does rely on statistics to support his claim, but does so to "reflect[] the result of this discrimination" – not to stand alone as proof of disparate impact. *Id.* at ¶ 26 (alleging that "70 [percent] (if not more) of Accenture Consulting and Accenture Technology's United States-based workforce is South Asian . . . as is the vast  majority of its managerial and supervisory

---

[7] Moreover, for purposes of class certification, "a common mode of exercising discretion that pervades the entire company" can constitute a general policy actionable for disparate impact claims. *Dukes*, 564 U.S. at 356; *see also Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 72-73 (S.D.N.Y. Mar. 30, 2018) ("[A]s to Plaintiff's disparate impact claims, the central question is whether a 'general policy of discrimination' can exist where [Defendants'] managers use discretion in making employment decisions.").

staff," which is disproportionate when considered alongside South Asian representation in the

United States population more broadly). Accenture's arguments therefore that "bare allegations

that 'contend only that there is a bottom line . . . imbalance in the work force are insufficient' to

support a disparate treatment claim," *see* Def.'s Mem. at 23, are unavailing, as Mr. Walker has

elsewhere sufficiently alleged a link between the allegedly identified practices and impact on

non-South Asian workers. *See, e.g.*, *Jenkins*, 646 F. Supp. 2d at 469 ("To the extent the

defendants' argument is that a plaintiff must provide statistical support for a disparate impact

claim in order to survive a motion to dismiss, that argument is incorrect," as "[i]t would be

inappropriate to require a plaintiff to produce statistics to support her disparate impact claim

before the plaintiff has had the benefit of discovery."). At this stage, Accenture's claims that Mr.

Walker has "fail[ed] to connect the dots to show how these alleged practices 'causally resulted'

in 'disparities in [Accenture's] workforce," and that his proffered statistics are meaningless

without a "showing that it makes other plausible non-discriminatory explanations very unlikely,"

are therefore premature. *See* Def.'s Mem. at 22-23.

> Accordingly, Mr. Walker's Title VII disparate impact claim will not be dismissed.

### c.   The Title VII Disparate Treatment Claim

> In a disparate-treatment case, "a plaintiff must establish that the defendant had a

discriminatory intent or motive." *Palmer v. Fannie Mae*, 755 F. App'x 43, 45 (2d Cir. 2018)

(summary order) (quoting *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project,

Inc.*, 576 U.S. 519, 524 (2015)).

> In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court

established a burden-shifting framework to evaluate claims of employment discrimination and

outlined the elements of a prima facie case. Consistent with this decision, in the Second Circuit,

a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) there is "at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). A plaintiff's burden for establishing a prima facie case is *de minimis. Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) ("We have characterized plaintiff's prima facie burden as 'minimal' and '*de minimis.*'") (citing *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)).

In the initial pleading stages, an "allegation of facts supporting a minimal plausible inference of discriminatory intent suffices . . . because this entitles the plaintiff to the temporary presumption of *McDonnell-Douglas* until the defendant furnishes its asserted reasons for its action against the plaintiff." *Doe v. Columbia Univ.*, 831 F.3d 46, 55 (2d Cir. 2016); *see also Dawson v. N.Y. City Transit Auth.*, 624 F. App'x 763, 770 (2d Cir. 2015) (summary order) ("At the pleading stage, district courts would do well to remember th[e] exceedingly low burden that discrimination plaintiffs face...."). The allegations need not, however, give "plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination." *Littlejohn*, 795 F.3d at 311.

Accenture argues that Mr. Walker's disparate treatment claims are insufficient because Mr. Walker "fails to plausibly allege that Accenture acted with a discriminatory motivation or that such a motivation was the cause of the adverse employment actions he claims to have experienced." Def.'s Mem. at 25. Accenture argues that the "sole fact" alleged by Mr. Walker that bears on discriminatory motive is the 70 percent statistic, which Accenture argues is insufficient to create an inference of discriminatory motivation or to make other plausible non-discriminatory explanations very unlikely. *Id.* at 26. Accenture argues further that Mr. Walker

39

fails to allege facts showing that race and/or national origin were "but for" causes of any adverse action, as Mr. Walker has only alleged that he "performed well" but was "never promoted" and was eventually benched. *Id.* at 26-27.

With respect to Mr. Walker's failure-to-hire claims, Accenture argues that absent any allegations that a South Asian person was selected instead of him, or that he was rejected because he was not South Asian, these do not sufficiently allege discriminatory motivation. *Id.* at 27-28.

Mr. Walker argues that he has stated a claim for disparate treatment on the ground that "statistics alone may constitute prima facie proof of a pattern or practice of discrimination." Pl.'s Opp'n at 27 (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977); *United States v. City of N.Y.*, 717 F.3d 72, 84 (2d Cir. 2013)). He argues this is particularly true in cases, allegedly like his, where there is a "gross statistical disparity" between an employer's workforce and the relevant labor market. *Id.* (alteration omitted). Finally, Mr. Walker argues that the Amended Complaint alleges more than statistics alone, as it describes "Accenture's [alleged] four-pronged discriminatory scheme to favor South Asians," and alleges that Mr. Walker "was a victim of that discriminatory scheme." *Id.* at 28.

The Court agrees.

Mr. Walker's Amended Complaint sufficiently states a claim for disparate treatment at this stage in the litigation. The Second Circuit has made clear that in a disparate-treatment case, "absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311. Mr. Walker's

Complaint satisfies this standard as it contains allegations as to each of these elements. *See, e.g.*, Am. Compl. ¶ 5 ("Plaintiff Matthew Walker . . . is Caucasian."); *id.* ¶¶ 27-29 ("Mr. Walker is a highly skilled and experienced performance engineer with considerable academic and work experience."; "[H]e holds a B.S. in Accounting and Information Systems . . . and has over ten years of professional experience."; "The client was impressed by Mr. Walker's performance and later asked for him to return for subsequent projects."); *id.* ¶ 31 (discussing Mr. Walker's "termination," which he alleges was "pretextual" and was instead attributable to "Accenture's pattern or practice of discrimination"); *id.* ¶ 32 ("Between 2016 and 2019, Mr. Walker applied to more than twenty different positions with Accenture . . . but Accenture failed to hire him each time because of the company's systematic and continuous discriminatory scheme."); *id.* ¶ 34 ("Mr. Walker was well qualified for these roles, given his over ten years of experience in performance engineering. . . ."). At this stage of the case, he is not required to "give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination." *Littlejohn*, 795 F.3d at 311.

Accordingly, Mr. Walker's Title VII disparate treatment claim will not be dismissed.

### d.   The Section 1981 Disparate Treatment Claim

"The legal standard for finding disparate treatment liability [under § 1981] is the same [as under Title VII]: a plaintiff's claims are subject to the three-step, burden-shifting framework of *McDonnell Douglas*." *Saliga v. Chemtura Corp.*, No. 12-cv-832 (VAB), 2015 WL 5822589, at *4 (D. Conn. Oct. 1, 2015). Therefore, Mr. Walker's § 1981 claim likely survives given the Court's Title VII analysis above.

Accenture, however, offers a "separate reason" for why the § 1981 claim should be dismissed: that it "sounds in discrimination on the basis of national origin, not race." Def.'s Mem. at 28-30.

Section 1981 "protect[s] from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Such claims cannot rely "solely on the place or nation of . . . origin," or "religion." *Id.* "Although [§ 1981] never uses the word 'race,' the Supreme Court has construed it as forbidding 'racial' discrimination in public or private employment." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 604 (2d Cir. 2016). "Racial discrimination" under § 1981 "include[s] discrimination based on 'ancestry or ethnic characteristics.'" *Id.* 604-05 (quoting *St. Francis Coll.*, 481 U.S. at 613).

Accenture argues that although Mr. Walker discusses the South Asian "race," the claims alleged in the Amended Complaint show instead that Accenture allegedly preferences employees "on the basis of national origin—not race or ethnicity." Def.'s Mem. at 29-30. As Accenture argues, "[t]he Amended Complaint mentions 'race' or 'ethnicity' only a handful of times," and the "bulk of the 'discriminatory scheme' allegations relate to visa practices," allegations which "say[] nothing about that individual's race." *Id.* at 30. In Accenture's view, "an alleged preference for Indian nationals or 'visa holders' cannot and does not plead race discrimination under Section 1981." *Id.* (citation omitted).

Mr. Walker responds that race and national origin claims often overlap in cases like his, where the relevant subgroup has both racial and national origin characteristics. Pl.'s Opp'n at 28-29. He argues further that South Asian, as defined in the Amended Complaint, means "individuals who trace their ancestry to the Indian sub-continent," and that several courts have

previously found that South Asian (or equivalent terms) qualifies as a race under federal law. *Id.* at 29.

The Court agrees.

Several courts in this Circuit and others have found in the context of Section 1981 claims that "South Asian" may refer to a race or ethnicity sufficient to plead a disparate-treatment claim. *See, e.g., Baby v. Nassau Healthcare Corp.*, No. CV 14-3297 (JMA) (GRB), 2017 WL 3279091, at *10 (E.D.N.Y. Feb. 6, 2017) (plaintiffs had established a prima facie § 1981 claim where plaintiff was "born in India and [was] of South Asian ethnicity" under *Village of Freeport*, 814 F.3d at 607 ("We hold . . . that for purposes of Title VII, 'race' encompasses ethnicity, just as it does under § 1981.")); *Koehler v. Infosys Techs. Ltd.*, 107 F. Supp. 3d 940, 946-47 (E.D. Wisc. 2015) (denying motion to dismiss Section 1981 claim where "the plaintiffs are alleging that Caucasian and South Asian races are distinct, and that the defendant's failure to hire, promote, or retain was due to the fact that the plaintiffs are not of the South Asian race."); *Dixit v. N.Y. Dep't of Gen. Servs.*, 972 F. Supp. 730, 735 (S.D.N.Y. 1997) ("In general, 'Asian Indian' is most commonly a characterization of both race and national origin, since it denotes someone with Asian racial characteristics whose ethnic background is Indian.").  Indeed, "race and national origin discrimination claims may . . . be indistinguishable depending on the specific facts of a case." *Deravin*, 335 F.3d at 201.

In *Koehler*, the district court considered similar allegations as to "a customary and repeated practice of growing [defendant's] U.S. offices by setting visa quotas for additional South Asian workers, budgeting for the associated expense of securing the visas, and filling employment vacancies by assisting persons of the South Asian race to enter this country to work in the [defendants'] U.S. offices." 107 F. Supp. 3d at 948. The court rejected defendants'

arguments that plaintiffs had failed to "identify a distinct racial group," finding that "the complaint [is] clear that the plaintiffs regard their race as distinct from the 'South Asian race' that defendants allegedly favor." *Id.* at 946.

Though several of Mr. Walker's allegations focus on Accenture's visa practices, this, under the logic of *Koehler*, does not mean that these allegations are based only in national origin. Here, Mr. Walker's Amended Complaint sets forth multiple allegations that could plausibly pertain both to Accenture's allegedly disparate treatment of both those of Indian national origin and those of South Asian race. *See, e.g.*, Am. Compl. ¶ 17 (discussing Accenture's alleged preference for "South Asian workers located overseas"); *id.* ¶ 22 (discussing Accenture's preference for "South Asian candidates" even when recruiting and hiring individuals residing in the United States); *id.* ¶ 23 (discussing Accenture's alleged inflation of appraisal scores for "South Asian" employees, without mention of country of origin); *id.* ¶ 25 (discussing Accenture's "practice of retaining contract works, who are primarily South Asian").

The Court therefore cannot agree at this stage of the case with Accenture's argument that "[t]hat these individuals allegedly happen to have South Asian ancestry is incidental—under [Mr.] Walker's theory of the case—to the fact that they are foreign-born." Def.'s Reply at 8.

Accordingly, Mr. Walker's Section 1981 disparate-treatment claim will not be dismissed.

### 4. Jurisdiction Over Accenture PLC

Finally, Accenture argues that Mr. Walker's claims against Accenture PLC should be dismissed because Mr. Walker has failed to adequately allege any basis for personal jurisdiction against Accenture PLC and has failed to plausibly allege that Accenture PLC was his employer. Def.'s Mem. at 31.

Mr. Walker argues that he has sufficiently stated a claim against Accenture PLC under the "single employer" doctrine, that the Court has personal jurisdiction over Accenture PLC, and in the alternative, requests that the Court permit jurisdictional discovery as to Accenture PLC. Pl.'s Opp'n at 30-36.

"To prevail in an employment action against a defendant who is not the plaintiff's direct employer, the plaintiff must establish that the defendant is part of an 'integrated enterprise' with the employer, thus making one liable for the illegal acts of the other." *Brown v. Daikin America Inc.*, 756 F.3d 219, 226 (2d Cir. 2014) (quoting *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 (2d Cir. 2000). The Second Circuit has set forth a four-part test to determine where "a parent company . . . may be considered the employer of its subsidiary's employees." *Id.* (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235 (2d Cir. 1995)). Under this test, "[a] parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* (quoting *Cook*, 69 F.3d at 1240) (alteration in original). "Whether two related entities are sufficiently integrated to be treated as a single employer is generally a question of fact not suitable to resolution on a motion to dismiss." *Id.* However, "sparse allegations of agency" between a parent and subsidiary "are too conclusory to make a prima facie showing of personal jurisdiction." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86 (2d Cir. 2018); *see also Savage v. Scripto-Tokai Corp.*, 147 F. Supp. 2d 86, 93 (D. Conn. 2001) ("[M]ere ownership by a parent corporation of a subsidiary corporation present in the forum state generally will not subject the parent to personal jurisdiction in that forum.").

Accenture PLC is allegedly "incorporated in Dublin, Ireland." Am. Compl. ¶ 1. Mr. Walker sets forth no allegations as to Accenture PLC's contacts in Connecticut, and alleges only one link between Accenture PLC and Accenture LLP, which is that Accenture PLC "owns and operates a number of subsidiaries in the United States," including Accenture LLP, a "wholly owned subsidiary." *Id.* ¶¶ 1, 7. Mr. Walker, however, refers throughout his Complaint to "Accenture," defined to include both Accenture PLC and Accenture LLP. *See* Am. Compl. ¶ 1. Mr. Walker also incorporates by reference Accenture PLC's filings with the Securities and Exchange Commission, which state that Accenture PLC "operate[s] [its] business through subsidiaries of Accenture PLC," and that Accenture PLC "operate[s] globally with one common brand and business model, providing clients around the world with the same high level of service." Pl.'s Opp'n at 32. Mr. Walker has alleged no facts similar to those set forth in *Brown*, such as that Accenture LLP "closely directed the operations of its wholly owned subsidiary" or that Accenture PLC's approval "was required as to all significant actions by [the subsidiary]." 756 F.3d at 228.

The Court notes, however, that Mr. Walker has made a demand for jurisdictional discovery should the Court not be satisfied at this juncture that Mr. Walker has sufficiently demonstrated jurisdiction over Accenture PLC. Pl.'s Opp'n at 47. Given that Mr. Walker's Amended Complaint refers to "Accenture"-wide practices, defined to include both Accenture LLP and Accenture PLC, which could plausibly implicate both the subsidiary and the parent corporation, the Court will permit Mr. Walker to conduct discovery "in order to develop the factual record requisite for such a showing."[8] *Texas Intern. Magnetics, Inc. v. BASF Aktiengesellschaft*, 31 F. App'x 738, 739 (2d Cir. 2002).

---

[8] In *BASF*, the Second Circuit distinguished the case from *Jazini v. Nissan Motor Co.*, 148 F.3d 181 (2d Cir. 1998), which Accenture relies upon to argue that Mr. Walker is not entitled to jurisdictional discovery. Def.'s Reply at 10.

Accordingly, the Court will permit Mr. Walker to conduct jurisdictional discovery into the extent of the corporate relationship between Accenture PLC and Accenture LLP.

For the foregoing reasons, Accenture's motion to dismiss the Amended Complaint therefore will be denied.

### B. Accenture's Motion for Sanctions

Under Rule 11, if a party presents arguments which "harass, cause unnecessary delay, or needlessly increase the cost of litigation," or whose "claims, defenses, and other legal contentions are [un]warranted by existing law or [are supported by [ ]frivolous argument[s], for extending, modifying, or reversing existing law or for establishing new law . . . the [C]ourt may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(b)–(c).

"A pleading, motion or other paper violates Rule 11 either when it has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (emphasis omitted) (internal quotation marks omitted). Rule 11 requires that the conduct in question be objectively unreasonable and

---

As the Second Circuit discussed in *BASF*, *Jazini*, in which plaintiffs sued a Japanese automobile corporation in New York alleging carelessness and negligence in the design, manufacture, and testing of an automobile part based on injuries sustained in a car accident in Iran, was "readily distinguishable" because plaintiffs' jurisdictional allegations were "sparse," whereas plaintiffs' arguments in the case at bar were "neither sparse nor insufficiently specific; they are simply insufficiently developed at this time to permit judgment as to whether personal jurisdiction is appropriate." 31 F. App'x at 739. Here, Mr. Walker has alleged that "Accenture" (defined as Accenture LLP and PLC) "engages in continuous and systematic business contacts within the State of Connecticut and maintains a substantial physical presence in this State, including the operation of an office in Hartford, Connecticut," Am. Compl. ¶ 11; that Accenture LLC is an "agent" of Accenture PLC, Pl.'s Opp'n at 33-34; that Accenture PLC is liable under a "single-employer" theory, *id.* at 31-32; and that Accenture's "discriminatory abuses of the U.S. visa program and staffing of visa-holders are an 'important element of [Accenture PLC's] global business model,'" *id.* at 32-33.

therefore does not require a finding of subjective bad faith. *See Muhammad v. Walmart Stores E., L.P.*, 732 F.3d 104, 108 (2d Cir. 2013) (noting that sanctions issued on a party's motion require that an attorney's conduct be "objectively unreasonable").

Rule 11 requires that the party moving for sanctions give the party notice of the motion for sanctions before filing a motion with the Court. Fed. R. Civ. P. 11(c) (A motion for sanctions "must be served [on the defendant] under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.").

> At a minimum, the notice requirement mandates that the subject of a [Rule 11] sanctions motion be informed of: . . . [*inter alia*] the specific conduct or omission for which the sanctions are being considered so that the subject of the sanctions motion can prepare a defense. Indeed, only conduct explicitly referred to in the instrument providing notice is sanctionable.

*Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 389 (2d Cir. 2003) (quoting *Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999)) (alteration and emphasis in original). "These procedural protections are intended to reduce the number of motions for sanctions and to provide opportunities for parties to avoid sanctions altogether." *Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 141-42 (2d Cir. 2002) (citing *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1327 (2d Cir. 1995)).

In the Second Circuit, "[a]n informal warning in the form of a letter without service of a separate Rule 11 motion is not sufficient" to satisfy this safe harbor-provision. *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012). However, "informal" letters that "set[] forth in detail the factual and legal bases for a motion for sanctions and unequivocally indicate[] that [the party] planned to file a motion for sanctions if the disputed allegations were not withdrawn" is sufficient to satisfy the provision. *Montanez v.*

*D&D Auto, LLC*, No. 3:15-cv-397 (VAB), 2016 WL 1254199, at *18 (D. Conn. Mar. 29, 2016) (citing *Star Mark Mgmt., Inc.*, 682 F.3d at 176-77).

Accenture has moved for sanctions against Mr. Walker under Federal Rule of Civil Procedure 11(b)(3) and 28 U.S.C. § 1927. Def.'s Mot. for Sanctions. Accenture argues that Mr. Walker and his counsel violated Rule 11(b)(3) and 28 U.S.C. § 1927 by "willfully presenting to the Court an argument in opposition to Accenture's Motion to Dismiss that contains false and misleading factual allegations lacking evidentiary support" – namely, that the Separation Agreement was invalid based on a purported failure of consideration. Def.'s Mem. in Supp. of Sanctions at 1.

In Accenture's view, Mr. Walker "knows exactly what consideration he accepted and received in exchange for the Separation Agreement," which is the relief detailed in the Amick Affidavit (allegedly, "two weeks of pay, participation in a career transition program, and extended health benefits"), *id.* at 6; and the Separation Agreement itself described the consideration on its face, *id.* at 7-8. According to Accenture, Mr. Walker's counsel's actions "unreasonably and vexatiously" multiplied the proceedings in violation of 28 U.S.C. § 1927.

Mr. Walker responds that his assertion that the Separation Agreement is legally and facially invalid is "factually sound and legally supported by the record," Pl.'s Mot. for Sanctions at 6. In Mr. Walker's view, submissions signed by his counsel contain only two factual representations with respect to the release: first, that the only consideration identified for the release was "Separation Benefits under the Plan if you satisfy the eligibility requirements and all of the other conditions of the Plan," but "this 'Plan' document identifying what, if any, actual consideration supports the release is not part of the release, or the record in this case," *id.* (citing Pl.'s Opp'n at 12); and second, that "[s]ection 6 of the release document required [Mr.] Walker

49

to acknowledge that he was not relying on any promises outside the release itself," *id.* citing (Pl.'s Opp'n at 12 n.6). Mr. Walker also argues that Rule 11 is aimed squarely at legal arguments, and Accenture's motion instead attempts to distinguish Mr. Walker's claims "on a purely factual basis." *Id.* at 8.

With respect to 28 U.S.C. § 1927, Mr. Walker argues that Accenture fails to meet the provision's heightened pleading standard, as it fails to make "a particularized showing of bad faith" on the part of Mr. Walker's counsel. *Id.* at 9-10. Mr. Walker also cross-moves for sanctions against Accenture, arguing that Accenture's motion for sanctions was filed for the improper purpose of reemphasizing the legal arguments in its motion to dismiss. *Id.* at 11-14.

Here, though Accenture filed only an informal letter, *see* ECF No. 49-3 (June 24, 2020), it sufficiently set forth the basis for Rule 11 and statutory sanctions and notified Mr. Walker and his counsel that sanctions would be brought if allegations were not withdrawn. *Id.* The Court therefore could proceed to examine the merits of Accenture's Rule 11 motion.

Courts, however, "should, and often do, defer consideration of certain kinds of sanctions motions until the end of trial to gain a full sense of the case and to avoid unnecessary delay of disposition of the case on the merits." *Sang Lan v. Time Warner, Inc.*, No. 11 Civ. 2870 (AT) (JCF), 2015 WL 4469838, at *2 (S.D.N.Y. July 13, 2015). Though the Court "does not judge the merits of an action" in assessing whether a Rule 11 sanction should be imposed, *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 417 (S.D.N.Y. 2003), the Court is aware that evaluating the Separation Agreement at the heart of Accenture's sanctions motion – and Mr. Walker's, and his counsel's knowledge of the terms of that agreement, the validity of the Amick affidavit, and the surrounding factual circumstances of Mr. Walker's employment – presents a "heavily factual" inquiry that "would benefit from a full evidentiary record." *Sang Lan*, 2015 WL 4469838, at *2

(citing *Lorber v. Winston*, 993 F. Supp. 2d 250, 253 (E.D.N.Y. 2014); *Kingvision Pay-Per-View Ltd. v. Ramirez*, No. 05 Civ. 2778 (HB), 2005 WL 1785113, at *4 (S.D.N.Y. 2005)).

Given that Mr. Walker's claims survive this motion to dismiss, the Court therefore declines to consider Accenture's motion, and Mr. Walker's cross-motion, for sanctions until Mr. Walker's claims are adjudicated on the merits through an appropriate dispositive motion or trial. *See id.* ("Given the preference for resolving this type of Rule 11 motion after the development of the record and at the end of a case, and in light of the inordinate litigation delays both parties have caused over this case's four-year life span, I decline to consider this motion until the plaintiff's claims are addressed on their merits through an appropriate dispositive motion or at trial.").

## IV.   CONCLUSION

For the foregoing reasons, Accenture's motion to dismiss for failure to state a claim or, in the alternative, strike or modify the class allegations is **DENIED**.

With respect to Accenture's motion for sanctions, and Mr. Walker's cross-motion for sanctions, these are **DENIED** without prejudice to renewal until Mr. Walker's claims are addressed on the merits through an appropriate dispositive motion or at trial.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of December, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE